Nicholson, C. J.,
delivered tbe opinion of tbe court.
Complainants, Natban Martin, Natban Cline, and L. Bernheim, filed separate bills in tbe chancery court - at Nashville, against tbe Aetna Insurance Company, and W. D. Talbot, to bave three life policies issued to them, respectively, rescinded for fraud, and tbe amounts of premiums paid refunded. The three policies were issued on tbe same day, were in all respects tbe same, except as to amounts; tbe allegations of the several bills were substam tially tbe same, as well asi tbe statements of tbe answers, for which reasons they were consolidated, and beard to *362 getlie-r, the proceedings in the several cases, by agreement, being used, in all the cases.
Nathan Martin’s life was insured for $5,000, for the sole and separate use of his wife, Rosalie Martin; Nathan Cline’s for $10,000, of which $8,000 was for the benefit of his wife, Emma, and her children, and $2,000 for Abram and Henry Cline, brother’s children; and L. Bemheim’s for $10,000, of which $7,000 was for his wife, Ida, and $3,000 for three, sisters.
The several policies were dated at Hartford, Connecticut, on the 2d of March, 1867, and countersigned at Nashville, Tennessee, on the 18th of March, 1867, by "W. D. Talbot, the agent of the company at Nashville. The policies were all oar the “tear years’ plan of participating policy.” In each policy it is provided that the annual premium specified is payable on the 2d of March, each successive year’, for ten years. And among other stipulations are the following: “In case the said assured shall not pay the said annual premium on or before the several days hereinbefore mentioned for the payment thereof, then, and in every such case, the said company shall not be liable for the payment of the sum insured, or any part thereof, and this policy shall cease and determine; but it is agreed that, in the event this policy lapses from the non-payment of premium, after two payments of premiums have been made, to issue a paid-up policy for two-tentlis of the amount insured; three-case where this policy shall cease, or be or become void, case where this policy shall cease, or be, or become void, all payments made thereon shall be forfeited to the said company,” etc.
Instead of requiring the several complainants to pay the amounts of their annual premium in cash, it was agreed that one-half thereof should be paid in cash, in advance, and a note for the other half payable at twelve months, with interest. This process of paying one-half the premium in cash and the other half by note, was to be repeated *363 every year during the ten years. In pursuance of this agreement, the several complainants paid their premiums by cash and notes for the first four years.
The difficulty arose about the time the fifth annual premium was falling due. Complainants all allege, that “said Talbot, in his character of general agent, stated, among other thing's, that upon the said ten years’ scheme, the insured would have it in his power, at any time after two of the annual payments agreed upon should have been made, to take what was known and described as a paid-up participating policy, in lieu of the one they conditionally accepted, and that the contract of insurance would stand upon as favorable ground in every respect, to the full extent of the investment, as if the whole amount had been paid, explaining, that by this statement he. meant that the insured would realize, after he should have made the fourth payment agreed on, and at the time when the fifth payment should become due, the full benefit of a participating policy, that is to say, that the property accruing from the contract would be sufficient to extinguish the first note, and that at each succeeding payment, each successive note, according to the order in which they had been given, would, in like manner, be extinguished by accruing profits, so that, after the fourth payment, there would be no increase or accumulation of the debt incurred, and at the end of fourteen years the dividend on the whole sum thus understood to be invested, would be paid in cash, or, at the option of the insured, was, as he allowed, to operate as an enlargement of the policy. This, they allege, the said Talbot described as an especial feature of the scheme, and was, with complainants, a prevailing consideration.
Complainants further allege, that, while preparing to make their fifth payment of annual premiums, they were furnished by the agent, Talbot, with a statement showing that the first notes, instead, of being recognized as paid up by reception of profits, and canceled, as had been agreed *364 on, would be entitled only to be credited with some small amounts.
Complainants say, that, upon getting this statement, they immediately made up their minds to accept the alternative proposition before mentioned, as offered by said Talbot, at the inception of tire contract of insurance, and to take a paid-up participating policy for four-tenths of the whole amount of the policy, thereby altogether abandoning the original policy, and taking in lieu thereof a participating policy for four-tenths of the original amount; and that they so notified said agent. Of course; they say, this scheme contemplated leaving outstanding the four notes which were to be paid up in the manner already stated.
Complainants allege, that, soon after notifying the agent of their purpose to abandon the original policy, and to accept a paid-up participating policy for four-tenths thereof, the company, through their agent, Talbot, returned to complainants their several notes for the first four years, and sent, or handed to them, severally, paid-up, non-participating policies, that to Martin for about $680, and those to Cline and Bemheim for about $1,700 each, but complainants charge, that, on receiving these non-participating paid-up policies and their several notes, they at once charged the proceeding to be a gross fraud, and indignantly refused their acquiescence therein; and they now tender the several policies, together with their several notes, as parts of their respective bills. These papers, they say, as policies of insurance, are a fraud, not only because of their being of too small an amount, but by reason of their not being participating policies, and giving no' interest to complainants on their profits, as well as because the company delivered up the notes, instead of canceling the one just due, and holding the others subject to cancellation, -as agreed on.
It appears, from these allegations of the bills, that the fraud complained of consists in this, that Talbot induced complainants to enter into the contract of insurance, upon *365 the representation that, upon the ten-year participating plan, after the fourth annual premium, the dividends coming to complainants would pay up each year one of the notes given for half the premium, so that, at the end of ten years, all the cash portion of the premiums would be paid, and four of the premium notes would be outstanding, which, by the. fourteenth year, would be paid by their dividends. And, that, as further inducement, the agent agreed that, after two annual payments of premiums, if they chose to pay no more cash, they might surrender their original policies, and take in lieu thereof paid-up participating policies for two^-tenths, or three-tenths, or foxu’tenths of the original amount, according to the number of premiums they have paid; and that their outstanding premium notes would be paid up by their dividends; whereas; they allege, that, when the fifth premium became due, instead of their first premium notes being paid up by dividends and canceled, as promised, only a small credit was entered on each of the notes agreed to be canceled. The misrepresentation alleged consisted, therefore, in the statement that, upon the fourth year, the dividends would be sufficient to pay a premium note, or one-half of the annual premium, which would be 50 per cent, on the amount of the premium. It was this representation, in which complinants say they confided, which induced them to make the contract, and they charge that this representation was made falsely and fraudulently.
Complainants charge that the company was guilty of further fraud in issuing and sending to them paid-up nonparticipating policies instead of paid-up participating policies, when they notified the agent upon the falling due of the fifth annual premium, that they would abandon the original policies, and required paid-up participating policies.
The insurance company and Talbot answer, but not on oath. They admit the making of the contracts for insur *366 anee, but insist that the policies were issued to the beneficiaries named therein, and not to complainants themselves, and hence, that the beneficiaries ought to be parties. It is admitted that, after the payment of four annual premiums, in cash and notes, complainants, would have been entitled to participate in the dividends) until the ten .annual payments should be made in cash and notes; and' afterwards the dividends would have been appropriated to the principal and interest of the notes until both should be absorbed; but it is denied that Talbot pretended to know or say when that would be, though he may have said, that, if the dividends continued to be as large as they were the year previous, that it would be but a few years before the notes would be paid by the dividends.
It is answered that, after the four premiums had been paid, complainants elected to take, in lieu of the first policy, a paid-up policy; but defendants say that complainants did not want a paid-up participating policy, and only demanded a paid-up policy; that, accordingly, the premium notes and paid-up policies were delivered to complainants., and these were accepted in lieu of the first policies. Talbot answers that he made no misrepresentations, was guilty of no concealment, and practiced no fraud, and that any allegation and insinuation to the contrary are false.
Defendants say they are now willing to return the old policies, or issue new paid-up participating policies, if complainants will pay the interest already accrued, and will continue to pay the interest until the notes are paid in full by the dividends. The allegation in the bills that the paid-up policies and notes were not accepted, is denied as false.
As the answers were not on oath, the denials by defendants of the allegations of fraudulent misrepresentations, and as to the acceptance of the paid-up policies and the notes, only make up an issue.
The depositions of all three of the complainants were taken. They concur in proving that they were engaged in *367 business in Nashville; that they had no knowledge of the business of life insurance, and were disinclined to embark in it; that they were repeatedly called on at their business houses by the agent, Talbot, and urged to' take policies; that they derived all their information on the subject of life insurance from him, and that he explained the operation of various plans, and specially recommended the ten-year plan, showing by tables and figures its advantages as an investment.
These three witnesses prove that they were induced to enter into insurance contracts in consequence of the positive representations of Talbot, that upon the ten-year plan, after the fourth year, the dividends would amount to at least 50 per cent., and would be sufficient each year, during the ten years, to pay and satisfy one of the notes for half the annual premium, leaving four notes outstanding at the end of ten years, which would be paid off in dividends in four more years.
Several other witnesses prove that they had conversed with Talbot in reference to the ten-year plan, and that he had made similar statements to them as to’ the dividends being sufficient, after the fourth year, to pay each year one of the premium notes.
The deposition of Talbot, agent and defendant, was taken. In the course of his examination for defendants, the following interrogatories and answers occur:
Q. Did you manifest any fact,- or conceal or withhold any fact, to induce either of complainants to enter into the contract?
A. I did not.
Q. Did each of said parties fully understand this contract with the Aetna Company?
A. I thought they did, in full.
Q. Did you truthfully and fully explain to each of said *368 parties, before the contract was made, the terms and meaning thereof?
A. I did, or, at least, believed that they fully understood it.
Q. Did you say to either of said parties that the dividends would equal fifty per cent?
A. I say emphatically, I did not.
Q. Did you say to either of the parties, that after they had made ten payments, the dividends would absorb their unpaid notes in four years, or within any specified time?
A. I did not.
Q. Did you say to either of said parties, that when they had executed the fifth note, the first note would have been paid by dividends, and would be delivered up, or did you specify any time within which any of the notes would be paid by the dividends?
A. I did not. I informed each of the parties that if they would take fifty per cent, of an annual life rate in notes, instead of fifty per cent, of the ten-year life rate, and the dividends continued in the future -as in the past, that the dividends would pay the first note on the fifth payment, as the dividends were then fifty per cent, on the annual life plan, and that all the dividends on life policies were declared on the annual life rate, whether the payments were made in ten years or paid annually for life.
Q. Was it possible for you to specify when either of the notes would be paid by the dividends?
A. It wras not, nor any other mortal man.
Two witnesses were examined for defendants, who proved that they had been connected with Talbot in his office, and they never heard him represent that on the ten-year* plan the dividends would be fifty pea* cent., or would pay off the first note after four payments.
Some other witnesses proved that they had taken policies from Talbot, and he made no such representations to them.
*369 The characters of the complainants, and of Talbot,-are shown to be good. It is true that defendants have thought proper to prove that complainants are Jews or Israelites.
It can scarcely be necessary for us to remark, that this court can look neither to the nationality nor to the peculiar religious tenets of witnesses, in determining the weight of their testimony. These witnesses all stand before us on the same level as to credibility, and their testimony must be weighed according to fixed rules. According to these rules we are bound to hold that the testimony of the three complainants, corroborated as it is by other witnesses, outweighs the testimony of Talbot, and that the allegation is sustained, to' the effect, that on the ten-year plan the agent represented to complainants that the dividends, after the fourth payment, would be sufficient to pay off the first premium note, and that upon the payment of the fifth premium, and the execution of the fifth note, the first note would be paid off and canceled by the dividend; and so on, each year, during the ten years.
But it is said that this was not such a misrepresentation as cduld have misled complainants, and, therefore, that it was not fraudulent, because complainants must have known that it was impossible for Talbot to know what future dividends would be declared by the company. It is necessary to keep in view the relations between these parties. Talbot was the agent of a foreign corporation, which he represented as having assets to the amount of twenty millions of dollars. He was thoroughly informed as to all the intricacies and mysteries of the life insurance business, as well as with all the operations of his company. He was seeking-patronage for his company, and was soliciting it from persons who were ignorant of all the workings of the life insurance machinery. They were dependent on him for the knowledge and information on which he advised them-to invest their money. "What they desired was, not only to *370 make a safe but a paying investment, and their decision was to be made by confiding in his integrity and his superior knowledge. He knew what his company had been doing in the way of dividends for many years. He knew its ability and its means of making profits. Complainants prove that he said the dividends would be at least 50 per cent. He says himself that he told them that “the dividends were then fifty per cent, on the- annual life plan,” but he says it was impossible for him to- tell what they would be in the future. Yet three credible witnesses prove that he did undertake to state, from his knowledge of what the company had done in the past, and of its ability at that time, with confidence, that its dividends in the future would be ait least fifty per cent. This statement made to complainants, in their situation, would naturally have all the force of the statement of a fact, and we have their testimony that they confided in it, and were induced by it to enter into the contract.
But it is said the representation was no' more than the expression of the agent's opinion as to the future profits of the company. The proo^ however, does not sustain the assumption that Talbot merely expressed his opinion as to the future dividends of the company. It is proved that he represented what the dividends would be, and what would be the result at a given time. The representation is shown to have been false in fact, and could have been for no other purpose than to influence complainants, and that it did influence them to enter into a contract which they would not have entered into1 but for the representation. Knuckolls v. Lea, 10 Hum., 577.
It is suggested in argument that the conflict in the testimony may be reconciled upon the hypothesis that when Talbot represented to complainants that the dividends on their premiums paid in, after the fourth year, would be sufficient, to pay off their first premium notes, and so on, year after year, he was referring to- the rate of dividends *371 declared on the annual-life plan, upon the assumption that complainants would give their notes each year for 50 per cent, of the premium on the annual life plan, instead of 50 per cent, on the ten-year plan. It is true that Talbot, in his deposition, volunteers such an explanation of his representation, although in his answers he is content with general and broad denials of the allegations of the bills. But the testimony of the three complainants is so directly and irreconcilably in conflict with this hypothesis that we are unable to adopt it. One of the- complainants, Cline, on cross-examination by defendant, was ashed the question: “Did you understand him (Talbot) to guarantee that the dividends would be equal to fifty per cent, of the amount paid in?” to which he answered: “His language was, that your dividends will be fifty per cent. I don’t know that he used the word guarantee, but I took it to be a guarantee from him. My reason is, that he said to me positive, as I understood, that my first note would be returned to me by my making the fifth payment, and so on by the sixth, and so on.” The other two witnesses testify substantially to the same effect.
But if we could adopt this hypothesis, it would result that the contract was entered into under mutual error as to its terms, and in that view the contracts were invalid. 1 Story’s Eq., 134.
It is next insisted for defendants that if Talbot was guilty of procuring the contracts by fraudulent representations, complainants waived the consequences of the fraud by accepting paid-up policies after discovering the fraud. It is certainly true, that if a party, with a full knowledge that he has been defrauded and cheated, ratifies his contract, it is afterwards too late to ask a rescission. Knuckolls v. Lea, 10 Hum., 582.
In their answer defendants rely upon the defense that complainants accetped the new paid-up, non-participating policies in lieu of the first ten-year participating policies. *372 And Talbot, in Ms testimony, says, that when complainants notified him that they had abandoned the first policies, he explained to them the difference between a paid-up policy simply, and a paid-up participating policy, and that they preferred the former, whereupon he procured simple paid-up policies, and delivered them, together with the premium notes, all which complainants accepted.
Complainants all state, that as soon as they discovered that their first premium notes were not satisfied and canceled by their dividends, they notified Talbot that they would abandon the first ten-year policies, and demanded paid-up policies for four-tenths of their amounts, in pursuance of their understanding as to their rights when they entered into the insurance contracts. They state that in a few days, Talbot, instead of giving to. them paid-up participating policies for four-tenths of the original amounts, as. promised, delivered to them simple paid-up policies, at.the same time returning to them their premium notes. They all deny that they accepted these, policies in lieu of the original policies, but as soon as they discovered the 'character of the policies they refused to accept them in lieu of their original policies, but charged Talbot at once with having swindled them in giving them simple paid-up policies instead of paid-up participating policies, according to this agreement. They admit that soon afterwards, Talbot offered to take back the last policies, and substitute for them paid-up participating policies, if complainants would pay the interest on the notes, and so continue to pay until they were satisfied by dividends. But they state that when this offer was made they had determined to commence suit, and for that purpose had placed the policies and notes in the hands of their counsel. Having been swindled, as they charge, in the attempt to impose upon them the simple paid-up policies instead of the paid-up participating policies, they were, unwilling to have any further transactions *373 ■with the company or their agent, but to rely upon getting their rights at law. ;
The proof is satisfactory, that when complainants determined to abandon and surrender their original ten-year policies, they were unwilling to take in lieu thereof paid-up participating policies for four-tenths thereof, according to the original understanding with Talbot, and if such policies had been delivered to them, as they demanded, this would have been a waiver of all questions of fraud in the procurement of the first policies. But the proof shows that the policies furnished were not those which they had demanded, and hence their receiving of these policies, but at the same time repudiating them as unsatisfactory, cannot be regarded as a waiver of their right to- rely upon the fraud in the original transaction. Upon discovering that the policies demanded had not been furnished, they had a perfect right then to decline to accept any other policies, and to resort to the courts for redress.
It follows that as the original contracts of insurance were procured by fraudulent representation, the same were void ab initio, and complainants have a right to have them so declared, and to have a decree for the money paid by them, respectively. As the money paid by complainants never became the property of the company, in consequence of the fraud, the several beneficiaries for whose benefit the investment was sought to be made, acquired no interest in the policies, and, therefore, are not proper or necessary parties.
The chancellor arrived at the same conclusions, and we affirm his decree with costs.